| | | |
|---|---|---|
| Paul Hicks | * | IN THE |
| 1130 Quo Avenue | | |
| Capital Heights, MD 20743 | * | UNITED STATES DISTRICT |
| Plaintiff, | * | COURT |
| v. | * | FOR THE |
| Daniel W. Lucas, Inspector General | * | DISTRICT OF COLUMBIA |
| D.C. Office of the Inspector General | | |
| 717 14th Street, NW, 5th Floor | * | |
| Washington, DC 20005 | | |
| | * | |
| Defendant. | | |
| | * | |
| Serve on: | | Case No.: |
| | * | |
| Muriel Bowser, Mayor | | |
| D.C. Executive Office of the Mayor | * | |
| John A. Wilson Building | | |
| 1350 Pennsylvania Avenue, NW | * | |
| Washington, DC 20004 | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT

**COMES NOW**, Paul Hicks, by and through his attorneys, Paul V. Bennett, Esq. and

Bennett & Associates, P.C., and hereby sues Daniel W. Lucas, Inspector General, District of

Columbia Office of the Inspector General (hereinafter "OIG") and states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e, et seq. (hereinafter "Title VII").

2.      This Court has jurisdiction pursuant to the Age Discrimination in Employment Act of

1967, as amended, 29 U.S.C. §§ 621 et seq. (hereinafter "ADEA").

3.      This Court has jurisdiction pursuant to the False Claims Act, 31 U.S.C. §§ 3729 et

seq. (hereinafter "False Claims Act").

4.     This Court has jurisdiction pursuant to the D.C. False Claims Act, D.C. CODE §§ 2-381.01 et seq. (hereinafter "D.C. False Claims Act").

5.     This Court has jurisdiction pursuant to the D.C. CODE §§ 1-615.51 et seq.

6.     That all the actions complained of herein took place at the D.C. Office of the Inspector General (hereinafter "OIG" or "the Agency") in Washington, D.C.

7.     That at all times relevant hereto, Defendant OIG is a D.C. government agency employing twenty (20) or more persons, and is an "employer" within the meaning of Title VII and the ADEA.

8.     In accordance with Title VII and the ADEA, Plaintiff timely filed a Charge of Discrimination with the D.C. Office of Human Rights on May 4, 2015, which was contemporaneously cross-filed with the U.S. Equal Employment Opportunity Commission. On August 3, 2015, Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission. Therefore, Plaintiff has properly exhausted his administrative remedies before filing suit and his lawsuit has been timely filed.

## FACTS COMMON TO ALL COUNTS

9.     Plaintiff's race is African-American. Defendant OIG was aware at all times herein of Plaintiff's race.

10.    Plaintiff is a sixty-eight (68) year old male with a date of birth of October 18, 1947. Defendant OIG was aware at all times herein of Plaintiff's age.

11.    Plaintiff was hired by Defendant OIG in approximately October of 2007 as an Auditor. In approximately October of 2008, Plaintiff was promoted to Senior Auditor.

On or around October 11, 2010, Plaintiff was promoted to Director of Medicaid Audits and served in this position until approximately August 15, 2014.

12. As of August 15, 2014, Plaintiff's annual salary was approximately ninety-one thousand dollars ($91,000.00). Plaintiff also received employment benefits while working for Defendant OIG, including, but not limited to, retirement contributions and health and life insurance benefits.

13. Plaintiff's job duties as Director of Medicaid Audits included, without limitation, performing and supervising audits pertaining to D.C. Medicaid.

14. From approximately October 11, 2010 to August 15, 2014, Plaintiff's immediate supervisor was LaDonia Wilkins (African-American and age in her early fifties (50's)), Deputy Assistant Inspector General for Audits.

15. From approximately October 11, 2010 to August 15, 2014, Plaintiff's second-level supervisor was Ronald King (Caucasian and believed to be younger than Plaintiff), Assistant Inspector General for Audits.

16. In approximately July of 2011, Plaintiff began working on the "Nursing Home Performance" audit.

17. In approximately August of 2011, Plaintiff discovered that approximately one hundred million dollars in D.C. Medicaid payments should not have been paid out to medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud.

18. For the appraisal period October 1, 2011 to September 30, 2012, Ms. Wilkins issued Plaintiff an overall rating of "4 – Highly Effective Performer."

3

19. In approximately June of 2012, Plaintiff submitted a draft audit report for "Nursing Home Performance" and identified therein poor quality care and internal control deficiencies in D.C. nursing facilities.

20. In approximately September of 2012, Plaintiff began working on the "Medicaid State Plan/Program Integrity" audit.

21. For the appraisal period October 1, 2012 to September 30, 2013, Ms. Wilkins issued Plaintiff an overall rating of "3 – Valued Performer."

22. In approximately March of 2013, Plaintiff submitted an updated draft audit report for "Nursing Home Performance" and identified therein poor quality care and internal control deficiencies in D.C. nursing facilities.

23. In October of 2013, Plaintiff reported his preliminary "Medicaid State Plan/Program Integrity" audit findings to Mr. King. Plaintiff specifically discussed the above-described one hundred million dollars in D.C. Medicaid payments which should not have been paid out to medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud.

24. Sometime in October of 2013, pursuant to Mr. King's instructions, Plaintiff met with Susan Kennedy (Caucasian and age unknown), Assistant Inspector General for OIG's Medicaid Fraud Control Unit (MFCU), Mr. King, and Leroy Rose (Jamaican and age approximately in his fifties (50's)), OIG Auditor. During this meeting, Plaintiff explained that the "suspended payments" finding needed to be included in the "Medicaid State Plan/Program Integrity" audit report. However, Mr. King expressed hesitation about including this finding in the audit report.

25.    During the first quarter of 2014, Plaintiff met with Mr. King, Ms. Wilkins, and Mr. Rose. Mr. King attempted to suppress Plaintiff's "suspended payments" finding and contended to follow Plaintiff's recommendation would have negative implications for the OIG's Medicaid Fraud Control Unit. Mr. King thereby told Plaintiff that the one hundred million dollars in D.C. Medicaid payments were unrelated to the "Medicaid State Plan/Program Integrity" audit and should not be discussed in the audit report.

26.    On May 16, 2014, Mr. King issued Plaintiff an unsatisfactory mid-term performance review for allegedly making untimely progress in completing audit reports. Consequently, Plaintiff's Alternative Work Schedule ("AWS") was revoked.

27.    Contrary to OIG's policies, Plaintiff did not receive supervisory counseling nor was he placed on a Performance Improvement Plan ("PIP") prior to receiving the unsatisfactory mid-term performance review.

28.    In approximately June of 2014, Plaintiff submitted a draft audit report for "Medicaid State Plan/Program Integrity." Pursuant to Mr. King's orders, Plaintiff did not include the "suspended payments" finding in the audit report.

29.    In approximately June of 2014, Roy Simmons, Director for Contracts and Procurement Audits, (African-American and age approximately in his mid-sixties (60's)), told Plaintiff that Mr. King wanted to fire Plaintiff.

30.    On or around July 22, 2014, Plaintiff submitted updated draft audit reports for "Medicaid State Plan/Program Integrity" and "Nursing Home Performance." Plaintiff discussed the D.C. nursing facilities' poor quality care and internal control deficiencies in the "Nursing Home Performance" audit report.

31.     On July 23, 2014, Ms. Wilkins and Mr. King held a meeting with the OIG Audit

Division Management Team, which included Plaintiff, Dinell Arnold, Director for

Program Audits, (African-American and age approximately in her late thirties (30's) /

early forties (40's)), Robert Binelli, Director of Information Technology Audits,

(Caucasian and age approximately in his late forties (40's) / early fifties (50's)),

Michael Onojeta, Director of Compliance of Prior Performance Audits, (African and

age approximately in his forties (40's)), Jim Segar, Director of Financial Audits,

(Caucasian and age approximately in his mid-sixties (60's)), and Mr. Simmons.

32.     During the meeting on July 23, 2014, Ms. Wilkins addressed the OIG Audit Division

Management Team's alleged unsatisfactory work performance. Ms. Wilkins stated

that all of the aforementioned Directors took too much time to complete audit reports

and did not adequately manage their staff.

33.     On July 29, 2014, contrary to Ms. Wilkins' belief that the "Medicaid State

Plan/Program Integrity" and "Nursing Home Performance" audit reports ought to be

formally issued, Mr. King cancelled them.

34.     On July 31, 2014, Plaintiff received an email from Ms. Wilkins summoning him to

attend a "follow-up meeting." When Plaintiff arrived at the meeting, he was

immediately terminated from employment without explanation, effective August 15,

2014. Contrary to OIG's policies, Plaintiff never received a PIP prior to his

termination from employment.

35.     At all times relevant herein, Plaintiff met and/or exceeded OIG's legitimate job

expectations.

## COUNT I
## RACIAL DISCRIMINATION
### (Disparate Treatment)
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §§ 2000e et seq.

36.    Plaintiff hereby restates and incorporates paragraphs 1 through 35 of this Complaint as though fully set forth herein.

37.    Plaintiff was qualified and satisfactorily performing his duties as Director of Medicaid Audits.

38.    That Defendant carried out the aforementioned acts of discrimination against Plaintiff on the basis of his race (African-American) – a protected class under Title VII.

39.    That the aforementioned acts constitute unlawful practices pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.

40.    That the effect of the practices complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race (African-American).

41.    That the unlawful employment practices complained of above were intentional.

42.    That similarly-situated employees outside the protected class, including, but not limited to, Robert Binelli, Director of Information Technology Audits, (Caucasian) and Jim Segar, Director of Financial Audits, (Caucasian), were not subjected to the same or similar severe adverse employment actions that Plaintiff endured, including, but not limited to, having AWS revoked and terminated from employment, despite their having made untimely progress with conducting fieldwork and in completing audit reports.

43.     Additionally, Yvonne Loudin (Caucasian), Director of Medicaid Audits prior to

        Plaintiff, did not release two (2) audit reports, failed to complete fieldwork necessary

        for audit projects, and refused to use electronic reporting software ("Teammate") as

        directed by upper management, yet she was not terminated from employment.

44.     That the discriminatory actions, as set forth above, have caused and will continue to

        cause Plaintiff to suffer lost earnings and earning capacity, severe emotional distress,

        humiliation, and mental anguish.

45.     That the intentional discriminatory actions of Defendant, as alleged above, were done

        with malice and/or with reckless indifference to Plaintiff's rights.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

### COUNT II
### AGE DISCRIMINATION
### (Disparate Treatment)
Age Discrimination in Employment Act of 1967, as amended,
29 U.S.C. §§ 621 et seq.

46.     Plaintiff hereby restates and incorporates paragraphs 1 through 35 of this Complaint

        as though fully set forth herein.

47.     Plaintiff was qualified and satisfactorily performing his duties as Director of

        Medicaid Audits.

48.     Plaintiff was subjected to adverse treatment, including without limitation, revocation

        of AWS and termination from employment.

49.     Plaintiff's age was the "but-for factor" behind the described adverse treatment, as

        similarly-situated younger employees, Mr. Binelli, Director of Information

        Technology Audits, (age approximately in his late forties (40's) / early fifties (50's)),

        Dinell Arnold, Director for Program Audits, (age approximately in her late thirties

8

(30's) / early forties (40's)), Michael Onojeta, Director of Compliance of Prior Performance Audits, (age approximately in his forties (40's)), and Slemo Warigon, Director of Technical Audits, (age approximately in his forties (40's))), were not subjected to said adverse treatment, despite their having made untimely progress with conducting fieldwork and in completing audit reports.

50.    Additionally, Yvonne Loudin (age in her forties (40's)), Director of Medicaid Audits prior to Plaintiff, did not release two (2) audit reports, failed to complete fieldwork necessary for audit projects, and refused to use electronic reporting software ("Teammate") as directed by upper management, yet was not terminated from employment.

51.    That the intentional discriminatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

52.    As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost future earnings capacity and emotional distress, and incurred attorneys' fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

### COUNT III
### RETALIATION
### The False Claims Act, 31 U.S.C. §§ 3729 et seq.

53.    Plaintiff hereby restates and incorporates paragraphs 1 through 35 of this Complaint as though fully set forth herein.

54.    31 U.S.C. § 3730(h) protects employees from being retaliated against for opposing fraudulent activities in order to prevent the United States Government from being defrauded.

55.   31 U.S.C. § 3729(a)(1)(G) makes it illegal to knowingly conceal or avoid an
      obligation to pay the United States Government.

56.   42 C.F.R. § 455.23 requires the D.C. Medicaid Agency to "suspend all Medicaid
      payments to a provider after the agency determines there is a credible allegation of
      fraud for which an investigation is pending under the Medicaid program against an
      individual or entity. . . ."

57.   D.C. CODE § 1-615.58(7) requires all District of Columbia Government employees to
      disclose information which they reasonably believe evidences a violation of federal,
      state, or local law.

58.   D.C. Medicaid is a joint federal-state health insurance program, thereby enabling
      D.C. Medicaid to receive federal funding.

59.   In approximately September of 2012, Plaintiff began working on the "Medicaid State
      Plan/Program Integrity" audit.

60.   In October of 2013, Plaintiff reported his preliminary "Medicaid State Plan/Program
      Integrity" audit findings to Mr. King. Plaintiff explained that approximately one
      hundred million dollars in D.C. Medicaid payments should not have been paid out to
      medical providers, but rather should have been suspended due to allegations of said
      medical providers having committed fraud.

61.   In October of 2013, during a meeting with Mr. King, Ms. Kennedy, and Mr. Rose,
      Plaintiff explained that the "suspended payments" finding needed to be included in
      the "Medicaid State Plan/Program Integrity" audit report. However, Mr. King
      expressed hesitation about including this finding in the audit report.

62. During the first quarter of 2014, Plaintiff met with Mr. King, Ms. Wilkins, and Mr. Rose. Mr. King attempted to suppress Plaintiff's "suspended payments" finding and contended to follow Plaintiff's recommendation would have negative implications for the OIG's Medicaid Fraud Control Unit. Mr. King thereby told Plaintiff that the one hundred million dollars in D.C. Medicaid payments were unrelated to the "Medicaid State Plan/Program Integrity" audit and should not be discussed in the audit report.

63. By reporting to Mr. King that Medicaid payments should not have been paid out to medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud, Plaintiff opposed the impropriety of Defendant OIG's conduct and thereby attempted to prevent the concealment of fraudulent activity. These actions thereby constitute a protected activity under 31 U.S.C. § 3730(h).

64. In faithfully carrying out his job duties and responsibilities as an auditor, Plaintiff was duty bound under D.C. CODE § 1-615.58(7) to report violations of federal and D.C. law to his supervisors.

65. In carrying out his job duties and responsibilities, Plaintiff was punished in such a way as to discourage other auditors from doing their jobs, thereby perpetrating further fraud on the D.C. and Federal Governments as well as defeating the purpose of carrying out an audit.

66. In retaliation for reporting fraudulent conduct, Defendant OIG issued Plaintiff an unsatisfactory mid-term performance review, revoked his Alternative Work Schedule ("AWS"), and terminated his employment, thereby amounting to illegal retaliation under 31 U.S.C. § 3730(h).

67. That the retaliatory employment practices described above have caused and will continue to cause Plaintiff to suffer lost earning capacity, severe emotional distress, humiliation, and mental anguish.

68. That the intentional retaliatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

69. As a direct result of Defendant OIG's retaliatory actions, Plaintiff has suffered actual and future lost wages and benefits, emotional distress, attorney's fees, and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

### COUNT IV
### RETALIATION
### The D.C. False Claims Act, D.C. CODE §§ 2-381.01 et seq.

70. Plaintiff hereby restates and incorporates paragraphs 1 through 35 of this Complaint as though fully set forth herein.

71. D.C. CODE § 1-301.115a(a-1) states one of the purposes of the D.C. Office of Inspector General is to prevent and detect fraud in D.C. Government programs.

72. D.C. CODE § 2-381.04 protects employees from being retaliated against for opposing fraudulent activities in order to prevent the D.C. Government from being defrauded.

73. D.C. CODE § 2-381.02(a)(6) makes it illegal to knowingly conceal or avoid an obligation to pay the D.C. Government.

74. D.C. CODE § 4-802 prohibits medical providers from committing fraud to receive benefits under the D.C. Medicaid Program.

75. 42 C.F.R. § 455.23 requires the D.C. Medicaid Agency to "suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of

fraud for which an investigation is pending under the Medicaid program against an individual or entity. . . ."

76. In approximately September of 2012, Plaintiff began working on the "Medicaid State Plan/Program Integrity" audit.

77. In October of 2013, Plaintiff reported his preliminary "Medicaid State Plan/Program Integrity" audit findings to Mr. King. Plaintiff explained that approximately one hundred million dollars in D.C. Medicaid payments should not have been paid out to medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud.

78. In October of 2013, during a meeting with Mr. King, Ms. Kennedy, and Mr. Rose, Plaintiff explained that the "suspended payments" finding needed to be included in the "Medicaid State Plan/Program Integrity" audit report. However, Mr. King expressed hesitation about including this finding in the audit report.

79. During the first quarter of 2014, Plaintiff met with Mr. King, Ms. Wilkins, and Mr. Rose. Mr. King attempted to suppress Plaintiff's "suspended payments" finding and contended to follow Plaintiff's recommendation would have negative implications for the OIG's Medicaid Fraud Control Unit. Mr. King thereby told Plaintiff that the one hundred million dollars in D.C. Medicaid payments were unrelated to the "Medicaid State Plan/Program Integrity" audit and should not be discussed in the audit report.

80. By reporting to Mr. King that Medicaid payments should not have been paid out to medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud, Plaintiff opposed the impropriety of Defendant OIG's conduct and thereby attempted to prevent the concealment of

fraudulent activity. These actions thereby constitute a protected activity under D.C. CODE § 2-381.04.

81.     In faithfully carrying out his job duties and responsibilities as an auditor, Plaintiff was duty bound under D.C. CODE § 1-301.115a(a-1) to report his findings to his supervisors to prevent and detect D.C. Medicaid fraud.

82.     In carrying out his job duties and responsibilities, Plaintiff was punished in such a way as to discourage other auditors from doing their jobs, thereby perpetrating further fraud on the D.C. and Federal Governments as well as defeating the purpose of carrying out an audit.

83.     In retaliation for reporting fraudulent conduct, Defendant OIG  issued Plaintiff an unsatisfactory mid-term performance review, revoked his Alternative Work Schedule ("AWS"), and terminated his employment, thereby amounting to illegal retaliation under D.C. CODE § 2-381.04.

84.     That the retaliatory employment practices described above have caused and will continue to cause Plaintiff to suffer lost earning capacity, severe emotional distress, humiliation, and mental anguish.

85.     That the intentional retaliatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

86.     As a direct result of Defendant OIG's retaliatory actions, Plaintiff has suffered actual and future lost wages and benefits, emotional distress, attorney's fees, and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT V**
**RETALIATION**
**D.C. CODE §§ 1-615.51 et seq.**

87.     Plaintiff hereby restates and incorporates paragraphs 1 through 35 of this Complaint
        as though fully set forth herein.

88.     D.C. CODE § 1-301.115a(a-1) states one of the purposes of the D.C. Office of
        Inspector General is to prevent and detect fraud in D.C. Government programs.

89.     D.C. CODE § 1-615.58(7) requires all District of Columbia Government employees to
        disclose information which they reasonably believe evidences a violation of federal,
        state, or local law.

90.     D.C. CODE §§ 1-615.53 prohibits a supervisor from taking a prohibited personnel
        action or otherwise retaliating against a D.C. Government employee because of the
        employee's protected disclosure.

91.     D.C. CODE § 4-802 prohibits medical providers from committing fraud to receive
        benefits under the D.C. Medicaid Program.

92.     42 C.F.R. § 455.23 requires the D.C. Medicaid Agency to "suspend all Medicaid
        payments to a provider after the agency determines there is a credible allegation of
        fraud for which an investigation is pending under the Medicaid program against an
        individual or entity. . . ."

93.     In approximately September of 2012, Plaintiff began working on the "Medicaid State
        Plan/Program Integrity" audit.

94.     In October of 2013, Plaintiff reported his preliminary "Medicaid State Plan/Program
        Integrity" audit findings to Mr. King. Plaintiff explained that approximately one
        hundred million dollars in D.C. Medicaid payments should not have been paid out to

medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud.

95.     In October of 2013, during a meeting with Mr. King, Ms. Kennedy, and Mr. Rose, Plaintiff explained that the "suspended payments" finding needed to be included in the "Medicaid State Plan/Program Integrity" audit report. However, Mr. King expressed hesitation about including this finding in the audit report.

96.     During the first quarter of 2014, Plaintiff met with Mr. King, Ms. Wilkins, and Mr. Rose. Mr. King attempted to suppress Plaintiff's "suspended payments" finding and contended to follow Plaintiff's recommendation would have negative implications for the OIG's Medicaid Fraud Control Unit. Mr. King thereby told Plaintiff that the one hundred million dollars in D.C. Medicaid payments were unrelated to the "Medicaid State Plan/Program Integrity" audit and should not be discussed in the audit report.

97.     By reporting to Mr. King that Medicaid payments should not have been paid out to medical providers, but rather should have been suspended due to allegations of said medical providers having committed fraud, Plaintiff disclosed information which he reasonably believed evidenced a violation of federal and state law, thereby constituting a protected disclosure under D.C. CODE § 1-615.52(a)(6).

98.     In faithfully carrying out his job duties and responsibilities as an auditor, Plaintiff was duty bound under D.C. CODE §§ 1-301.115a(a-1) & 1-615.58(7) to report his findings to his supervisors.

99.     In carrying out his job duties and responsibilities, Plaintiff was punished in such a way as to discourage other auditors from doing their jobs, thereby perpetrating further

fraud on the D.C. and Federal Governments as well as defeating the purpose of carrying out an audit.

100. The subsequent unsatisfactory mid-term performance review, revocation of Alternative Work Schedule ("AWS"), and termination from employment as set forth in the above-referenced Facts Common to All Counts constituted prohibited personnel actions under D.C. CODE § 1-615.52(a)(5)(A) and thereby amounted to illegal retaliation under D.C. CODE § 1-615.53.

101. Plaintiff's protected disclosures were a contributing factor in the alleged prohibited personnel actions taken against Plaintiff.

102. That the aforementioned acts of retaliation for making protected disclosures constitute unlawful employment practices pursuant to the D.C. CODE §§ 1-615.51 et seq.

103. That the effect of the practices complained of above was to adversely affect Plaintiff's status as a D.C. Government employee in retaliation for having engaged in protected disclosures.

104. That the unlawful employment practices complained above were intentional.

105. That the retaliatory employment practices described above have caused and will continue to cause Plaintiff to suffer lost earning capacity, severe emotional distress, humiliation, and mental anguish.

106. That the intentional retaliatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

107. As a direct result of Defendant OIG's retaliatory actions, Plaintiff has suffered lost future earnings capacity, emotional distress, attorney's fees, and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

## PRAYER FOR DAMAGES

WHEREFORE, for the foregoing reasons, Paul Hicks, Plaintiff, demands judgment against Defendant, Daniel W. Lucas, Inspector General, District of Columbia Office of the Inspector General ("OIG") as follows:

a.  $300,000.00 as compensatory damages;

b.  Prejudgment and post judgment interest;

c.  Award attorney's fees and costs, including expert witness fees, as allowed by law;

d.  And for such other and further relief as this Honorable Court deems just and equitable.

Respectfully Submitted,

_____/s/_____
Paul V. Bennett, Esq. (DC Bar No. 427358)
Bennett and Associates, P.C.
133 Defense Hwy., Suite 209
Annapolis, Maryland 21401
Tel: (410) 974-6000
Email: pbennett@paulvbennett.com

*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Paul Hicks, Plaintiff, hereby demands that this matter be tried by jury.

_____/s/_____
Paul V. Bennett, Esq. (DC Bar No. 427358)