# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PAUL HICKS,

      Plaintiff,

   v.

DISTRICT OF COLUMBIA,

      Defendant.

Civil Action No. 15-1828 (CKK)

## MEMORANDUM OPINION
(March 30, 2018)

Plaintiff Paul Hicks is an African American who was in his mid-sixties when Defendant District of Columbia terminated his job as Director of Medicaid Audits in the Office of the Inspector General. He does not accept Defendant's argument that he was fired because of alleged poor performance. Rather, Plaintiff argues that his dismissal was attributable to his race, his age, and retaliation for his insistence that Defendant comply with certain alleged reporting obligations for Defendant's alleged violations of Medicaid regulations.

Defendant presently seeks summary judgment as to all of Plaintiff's claims. Upon consideration of the briefing and evidence,[1] the relevant legal authorities, and the record as a whole, the Court **GRANTS-IN-PART and DENIES-IN-PART** Defendant's Motion for Summary Judgment, ECF No. 32.[2] The Court grants summary judgment to Defendant on

---

[1] The Court's consideration has focused on the following briefing and the evidence contained in attachments thereto:

- Def.'s Mot. for Summ. J., ECF No. 32 ("Def.'s Mot.");
- Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 33 ("Opp'n Mem."); and
- Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 34 ("Reply Mem.").

[2] The Court has considered the briefing and the record as a whole and determined in an exercise of its discretion that no hearing is necessary to resolve Defendant's Motion for Summary

Plaintiff's retaliation claims under the District of Columbia Whistleblower Protection Act, D.C. Code §§ 1–615.51 *et seq.* (2017), federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (2016), and District of Columbia False Claims Act, D.C. Code §§ 2–381.01 *et seq.* (2017). The jury must decide Plaintiff's claims of age discrimination under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.* (2016), and of racial discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (2016).

The Court also shall address a motion buried within Plaintiff's Opposition papers. With Defendant's consent, the Court **GRANTS** Plaintiff's Motion to Seal Certain Exhibits Which Accompany Defendant's Motion and Plaintiff's Opposition Thereto, ECF No. 33-5. Defendant's Exhibits 1, 3, 4, 5, and 9 attached to Defendant's Motion for Summary Judgment, ECF No. 32, shall be placed under seal pursuant to the parties' Protective Order, ECF No. 28. Plaintiff's Exhibits B, D, K, L, M, N, O, T, and aa, which accompany his Opposition to Defendant's Motion for Summary Judgment, ECF No. 33, also shall be placed under seal pursuant to the parties' Protective Order. The parties are reminded that documents subject to the parties' Protective Order must be filed in accordance with Local Civil Rule 5.1(h) and Paragraph 17 of that Protective Order in order to receive the benefit of sealing during the pendency of any motion to seal.

---

Judgment. *See* D.D.C. LCvR 7(f). If Plaintiff has determined that "Defendant's Reply does not technically raise 'new issues,'" and therefore does not warrant a sur-reply, then the Court finds that a hearing to address the alleged "additional factual assertions" of Defendant would be unproductive. *See* Pl.'s Req. for Oral Hr'g, ECF No. 35; *see also* Resp. to Pl.'s Req. for Oral Hr'g, ECF No. 36 (opposing oral hearing and indicating that Defendant's Reply identified portions of the record responsive to Plaintiff's assertions of material fact in his Opposition). Accordingly, the Court **DENIES** Plaintiff's Request for an Oral Hearing, ECF No. 35. In the instances where Defendant's Response to Plaintiff's Statement of Additional Material Facts That Are Not in Dispute, ECF No. 34-1, at 14-17, adds some additional factual information, the Court shall not consider that information to be undisputed material fact, because Plaintiff has not had an opportunity to respond to it.

# I. BACKGROUND

## A. Factual Background

The Court identified many of the facts of this matter when it decided Defendant's motion to dismiss Plaintiff's claims under the federal False Claims Act and District of Columbia False Claims Act. *See* Mem. Op. and Order, ECF No. 19, at 6-9. The Court presently shall set forth certain material facts that are supported by uncontroverted evidence now in the record.[3] Further facts, many of which are disputed, shall be addressed as necessary in pertinent portions of this Memorandum Opinion.

Plaintiff served as an auditor in the District of Columbia's Office of the Inspector General ("OIG"). Pl.'s Ex. K, ECF No. 33-16, at 1.[4] On September 27, 2010, OIG offered Plaintiff a

---

[3] The Court notes that it strictly adheres to the text of Local Civil Rule 7(h)(1) when resolving motions for summary judgment. Accordingly, it shall, as the Court advised the parties that it may, "assume that facts identified by the moving party in its statement of material facts are admitted, unless such facts are controverted in the statement filed in opposition to the motion." Am. Scheduling and Procedures Order, ECF No. 31, at 3. In setting forth the relevant background for Defendant's Motion for Summary Judgment, the Court therefore cites only to Defendant's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, ECF No. 32-2 ("Def.'s Initial Stmt."), unless Plaintiff has objected to the relevant aspects of Defendant's statement, in which case the Court shall also cite to Plaintiff's Response to Defendant's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, ECF No. 33-1 ("Pl.'s Stmt."). In addition, the Court notes that Plaintiff's response statement includes several additional facts that he asserts are not in dispute. *See* Pl.'s Stmt. ¶¶ 29-42. Defendant's Reply includes a response to Plaintiff's statement that addresses those further facts. Summ. Chart of Material Facts, ECF No. 34-1 ("Def.'s Reply Stmt."), ¶¶ 29-42. Where there is no dispute, the Court shall cite the additional facts as contained in Plaintiff's opposition statement. Where there is a dispute as to some aspects of Plaintiff's statement, but not to points the Court now sets forth as undisputed, the Court may cite Defendant's reply statement for the avoidance of doubt that Defendant's reply statement has been considered. Where appropriate, the Court also cites directly to evidence in the record. As discussed above in footnote 2, the Court shall not consider the additional factual information in Defendant's reply statement to be undisputed material fact.

[4] The parties' exhibits often include deficient page numbering, e.g., missing or partially obscured Bates numbers. The Court shall cite to a truncated form of the Bates number, where it is present in full, or, where Bates is not an option, as here, to the original page numbering of the underlying document or to the ECF page numbering of the document. References to depositions shall be to page and line numbers of the deposition transcripts.

promotion to Director of Medicaid Audits, an at-will position within OIG's Management Supervisory Service, and Plaintiff accepted the following day. Def.'s Initial Stmt. ¶¶ 1-2. While Director of Medicaid Audits, Plaintiff's job description included, *inter alia*, "scheduling and completing performance audits, estimating workloads and capability of staff, . . . [and] making adjustments in staff and workload to meet firm deadlines for special projects." *Id.* ¶ 3; Def.'s Ex. 2, ECF No. 32-4, at 064. He served in that position until August 15, 2014. *See* Def.'s Ex. 9, ECF No. 32-4, at 013.

Plaintiff was assigned the "Medicaid State Plan/Program Integrity" audit in September 2012. Def.'s Initial Stmt. ¶ 23. Among other audit reports for which Plaintiff was responsible during his employment was the "Nursing Home Performance and Administrative Salaries" audit. Pl.'s Stmt. ¶ 39; Pl.'s Ex. G, ECF No. 33-12, at 1 (citing various audits for which Plaintiff was director).

On September 15, 2013, Defendant provided Plaintiff with an annual performance evaluation for the period October 2, 2012, through September 30, 2013.[5] Def.'s Initial Stmt. ¶ 4; Def.'s Ex. 3, ECF No. 32-4. Notwithstanding the parties' competing interpretations of this evaluation, it is clear that some language is complimentary of Plaintiff's performance and other language is critical of his performance. *See generally* Def.'s Ex. 3, ECF No. 32-4. In addition to ratings in specific areas, the review gave Plaintiff an "Overall Summary" rating of "3 Valued Performer," specifically 3.15 out of 5.00. *Id.* at 049; Def.'s Initial Stmt. ¶ 9. The review also noted that "[d]uring this rating period at the Mid-Year period [Plaintiff] was operating in a satisfactory manner." Def.'s Ex. 3, ECF No. 32-4, at 049. The record contains a second version of this report

---

[5] Neither party comments on the fact that this performance evaluation purported to cover a period that was not yet completed.

showing Plaintiff's signature and a handwritten indication that it was "[r]eviewed and [a]cknowledged" on December 30, 2013. Def.'s Ex. 4, ECF No. 32-4, at 041; *see also* Def.'s Initial Stmt. ¶ 10 (making uncontested point that he read and signed evaluation).

In an April 2013 debrief regarding the Medicaid State Plan/Program Integrity audit, upper-level management and Plaintiff discussed the fact that Medicaid payments had not been suspended to certain healthcare providers who were under investigation for fraudulent activity by Defendant's Medicaid Fraud Control Unit ("MFCU"). Pl.'s Stmt. ¶ 29. Management disagreed with Plaintiff's assertion that this fact should be included in his audit report. *Id.*; Def.'s Reply Stmt. ¶ 29.

In October 2013, an employee of Defendant's Department of Healthcare Finance ("DHCF") emailed Plaintiff a list of providers whom DHCF had referred to MFCU for investigation but to whom payments were not suspended.[6] Def.'s Initial Stmt. ¶ 24. Also in October 2013, Plaintiff discussed with Ron King, Assistant Inspector General for Audits ("AIGA"), Plaintiff's belief that Medicaid payments to healthcare providers under investigation by MFCU should have been suspended. Pl.'s Stmt. ¶ 30; Def.'s Reply Stmt. ¶ 30. Plaintiff also discussed the payment non-suspension issue during meetings on October 21 & 22, 2013, and on December 2, 2013, with Susan Kennedy, Assistant Inspector General for the MFCU. Pl.'s Stmt. ¶ 32; Dep. of Paul Hicks at 84:9-12, Pl.'s Ex. E, ECF No. 33-10. At least one of those meetings included Mr. King, who voiced his concern with the inclusion of the payment non-suspension issue in the Medicaid State Plan/Program Integrity audit report. Pl.'s Stmt. ¶ 32.

---

[6] The Court shall refer to this as the "payment non-suspension issue" rather than use Plaintiff's term, the "suspended payments finding," to which Defendant objects. *See* Pl.'s Stmt. ¶ 29; Def.'s Reply Stmt. ¶ 29. The Court avoids the implication of taking a position, via terminology alone, on the legality of the suspension and on whether Plaintiff was the first to bring this "finding" to his superiors' attention.

The record contains a December 13, 2013, letter from Charles Willoughby, the District of Columbia Inspector General ("IG"), to Wayne Turnage, the Director of the DHCF, "to inform [the latter] of a serious concern that Susan Kennedy, Director of the Medicaid Fraud Control Unit (MFCU), has brought to my attention about suspension of Medicaid providers after they have been referred to the MFCU for investigation." Def.'s Ex. 13, ECF No. 32-4, at 0482. Mr. Willoughby reported Ms. Kennedy's finding "from DHCF personnel that no providers referred by DHCF to the MFCU in FY 2013 have had payments suspended." *Id.* at 0483. The letter also discusses federal Medicaid regulations regarding payment suspension and DHCF's efforts pursuant to a "good cause" exception therein. *Id.* Non-suspension was particularly concerning, the IG wrote, because of a January 2013 "CMS Comprehensive Program Integrity Review Draft Report" that documented the District of Columbia's failure "to suspend $59 million in payments for providers referred to the Medicaid Fraud Control Unit ("MFCU") for investigation." *Id.* at 3 (internal quotation marks omitted).[7]

During the first quarter of 2014, Plaintiff again discussed the payment non-suspension issue with OIG officials, first on March 11, 2014, during the "AIGA's Weekly Directors' Meeting," and then on April 10, 2014, in a meeting that included Mr. King and LaDonia Wilkins, Deputy AIGA.[8] *Id.* ¶¶ 33-34; *see also* Pl.'s Ex. U, ECF No. 33-26, at 1 (referring to Ms. Wilkins as "DAIGA").

---

[7] Only this last page of the letter lacks a Bates label.

[8] Oddly, when Defendant's Reply Statement quotes Plaintiff's Statement of Fact, it switches Plaintiff's two references to April 2014 to read April 2013. Def.'s Reply Stmt. ¶ 34. But Plaintiff expressly states in his underlying affidavit that this is April 2014. Pl.'s Aff., ECF No. 33-4, ¶ 22. Plaintiff's deposition also suggests April 2014. *See* Dep. of Paul Hicks at 73:17-22, 74:1-13, Pl.'s Ex. E, ECF No. 33-10. Defendant does not object to or comment specifically on the date. Accordingly, the Court refers here to April 2014 as the last of the meetings in evidence that discussed the payment non-suspension issue, but in any event, the specific date of this meeting is not material to the Court's decision.

Discussion at these meetings also included the Medicaid State Plan/Program Integrity audit report. Pl.'s Stmt. ¶¶ 33-34. Mr. King directed Plaintiff to remove the payment non-suspension issue from the draft Medicaid State Plan/Program Integrity audit report. Pl.'s Stmt. ¶ 34; Def.'s Reply Stmt. ¶ 34. Plaintiff argued during at least one meeting with Mr. King that the Government Accountability Office's ("GAO") Government Auditing Standards and 42 C.F.R. § 455.23 dictated that the payment non-suspension issue should be included in the Medicaid State Plan/Program Integrity audit report. Pl.'s Stmt. ¶ 35; Def.'s Reply Stmt. ¶ 35. Mr. King disagreed that the cited C.F.R. provision was applicable. Pl.'s Stmt. ¶ 35; Def.'s Reply Stmt. ¶ 35.

On May 16, 2014, Mr. King issued a memorandum that revoked Plaintiff's alternative work schedule ("AWS"), effective May 19, 2014. Def.'s Initial Stmt. ¶ 11; Def.'s Ex. 5, ECF No. 32-4, at 020.[9] The memorandum stated that "Paul Hicks has been rated in his mid term [sic] performance review as unsatisfactory based on 5 audit reports that have been long term in process and are required to be issued by September 30, 2014." Def.'s Ex. 5, ECF No. 32-4, at 020.

On approximately June 3, 2014, a draft Medicaid State Plan/Program Integrity audit report was submitted to Ms. Wilkins. Pl.'s Stmt. ¶ 37. A draft Nursing Home Performance and Administrative Salaries audit report also was submitted by July 22, 2014. Id. ¶ 40.[10]

During a "Special Called Meeting of [OIG's] Audit Division Management Team," on July 23, 2014, Ms. Wilkins indicated that she convened directors in order to "discuss the serious state of current audit deliverables, how we get through the current situation, and how we move forward

_____

[9] The Court cannot recall a reference in the record to what Plaintiff's AWS privileges specifically entailed.

[10] The Court assumes that "to Roy for IRR, 7/22/14" is the basis for Plaintiff's assertion that July 22, 2014, is the date by which this draft report was submitted. *See* Pl.'s Ex. G, ECF No. 33-12, at 1. This comment is not clearly consistent with the listing of "draft" report submission dates in other parts of the relevant chart, but because Defendant does not dispute, the Court shall accept this as fact for purposes of ruling on the present motion.

from this point." Def.'s Initial Stmt. ¶ 12; Def.'s Ex. 6, ECF No. 32-4, at 0250. According to a summary of that meeting, Ms. Wilkins

> noted that communications prior to now had not been fully open and honest, that the review work by directors has not been enough to prevent the current situation, and that the quality of the reports is not what it should have been, given the amount of time and money spent to perform these audits.

Def.'s Ex. 6, ECF No. 32-4, at 0250. Immediately following this point, under the header "Current Situation," the summary continues by stating that "[t]wo audits, Nursing Home Performance and Medicaid State Plan/Program Integrity, are so problematic that Mr. King is considering not issuing them," but that Ms. Wilkins "stated that she believes that we should release them in some manner." *Id.* While Ms. Wilkins "stated that we all are at fault, in some way, in terms of the work that we have been performing," "Director Paul Hicks took responsibility for the condition of the reports in question and the actions that led us to this point." *Id.* Two other OIG directors would each "carefully review" one of those two reports and "later today provide their recommendations to Ms. Wilkins and Mr. King. Mr. King will decide whether or not to issue the reports." *Id.* at 0250-0251. The remainder of the meeting summary, including the "Moving Forward" section, does not specifically name any other directors or reports but instead refers generally to what "directors" or "we" need to do. *See id.* at 0251 (stating, e.g., "we can't continue to take more than a year to complete audits").

The following day, a memorandum from Kenneth Bates, a senior auditor, sent "thru" Plaintiff to Mr. King and Ms. Wilkins on July 24, 2014, indicated a decision to cancel the Nursing Home Performance and Administrative Salaries audit report. That memorandum stated in entirety:

> After careful consideration and review of the documentations gathered during the audit fieldwork of project No: 11-1-20HT – Nursing Home Performance and Administrative Salaries, and additional consideration of administrative matters, we have decided to terminate this project. As a result, an audit report will not be issued on this project.

Pl.'s Stmt. ¶ 42; Pl.'s Ex. J, ECF No. 33-15.

The Medicaid State Plan/Program Integrity audit report also was cancelled, on an unspecified date. Pl.'s Stmt. ¶ 38 (stating only that "[s]ometime in June or July of 2014, Defendant cancelled the Medicaid State Plan Audit"); *see also* Pl.'s Ex. I, ECF No. 33-14 ("Open Audit Status Report Update" from "AIGA's Weekly Directors' Meeting" on July 29, 2014, listing audits without referencing the Medicaid State Plan/Program Integrity or Nursing Home Performance and Administrative Salaries audit reports).

Finally, in a July 31, 2014, letter from Blanche Bruce, Interim Inspector General, Defendant terminated Plaintiff's employment, without explanation, effective August 15, 2014. Def.'s Initial Stmt. ¶ 22; Def.'s Ex. 9, ECF No. 32-4, at 013. That letter also indicated that Plaintiff would be placed on administrative leave until the effective date of his termination and that he should "immediately" return property issued to him as a government employee. *Id.*

### B. Procedural History

Plaintiff brought this suit on October 27, 2015. Compl., ECF No. 1. The Amended Complaint, filed on December 22, 2015, presents a claim of racial discrimination under Title VII of the Civil Rights Act of 1964, as amended; a claim of age discrimination under the Age Discrimination in Employment Act of 1967, as amended ("ADEA"); a claim of retaliation under the federal False Claims Act ("FCA"); a claim of retaliation under the District of Columbia False Claims Act ("DCFCA"); and a claim of retaliation under D.C. Code § 1-615.51 *et seq*., which codifies the District of Columbia's Whistleblower Protection Act ("DCWPA"). Pl.'s First Am. Compl., ECF No. 10 ("Am. Compl."),

Plaintiff claims in his Amended Complaint that he had exhausted his administrative remedies under Title VII and the ADEA by filing with the U.S. Equal Employment Opportunity

Commission ("EEOC") and the D.C. Office of Human Rights on May 4, 2015, and receiving a Notice of Right to Sue from the EEOC on August 3, 2015. *See* Am. Compl. ¶ 9. Defendant does not contest this assertion.

On April 28, 2016, the Court denied Defendant's Motion to Dismiss Counts 3 & 4 of the Amended Complaint, finding that Defendant had not shown that Plaintiff failed to state FCA and DCFCA claims as to which relief could be granted. *See* Mem. Op. and Order, ECF No. 19, at 13.

Upon the conclusion of discovery, the Court set a briefing schedule for Defendant's currently pending motion.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of *some* factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis

in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor. *Liberty Lobby*, 477 U.S. at 255. "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting *Kuo–Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)) (internal quotation marks omitted). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory intent, the district court should approach summary judgment in an action for employment discrimination with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997) (internal quotation marks omitted), *reh'g en banc granted, opinion vacated*, 124 F.3d 1302 (D.C. Cir. 1997) (en banc); *see also Woodruff v. Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007) (citing *Aka*, 116 F.3d at

879-80).  The same standard arguably applies to retaliation claims.  *See Walker v. District of Columbia*, 279 F. Supp. 3d 246, 258 (D.D.C. 2017) (Kollar-Kotelly, J.) (taking "special caution" in DCWPA case).  Be that as it may, "a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence."  *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Calhoun v. Johnson*, No. CIV. A. 95-2397 (PLF), 1998 WL 164780 (D.D.C. Mar. 31, 1998)) (internal quotation marks omitted).  As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage he bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . .  trial"—simply by way of offering conclusory allegations, speculation, and argument.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III. DISCUSSION

#### A.  Claims Under Title VII and the Age Discrimination in Employment Act

The Court shall consider Plaintiff's Title VII and ADEA claims together, because they share a common analytical framework and, in this case, overlapping sets of facts.  *See Etokie v. Duncan*, 202 F. Supp. 3d 139, 148-49 (D.D.C. 2016) (citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1197 n.2, 1200 (D.C. Cir. 2008) (applying common framework)), *aff'd sub nom. Etokie v. DeVos*, No. 16-5243, 2017 WL 3725634 (D.C. Cir. May 31, 2017); *see also Baloch*, 550 F.3d at 1196 (specifically identifying common elements of Title VII and ADEA claims); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (assuming in absence of any dispute that Title VII framework articulated in *McDonnell Douglas* applies to ADEA claim).

1. <u>Analytical Framework for Racial and Age Discrimination Claims</u>

Title VII of the Civil Rights Act makes it unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (2016).  Similarly, the ADEA does not permit any employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1) (2016).

Where there is no direct evidence of discrimination, Title VII and ADEA claims are assessed pursuant to the burden-shifting framework originally set forth by the Supreme Court for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  The plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination.  To allege a *prima facie* case of discrimination, a plaintiff must show that he "is a member of a protected class," that he "suffered an adverse employment action," and that "the unfavorable action gives rise to an inference of discrimination." *Youssef v. F.B.I.*, 687 F.3d 397, 401 (D.C. Cir. 2012) (quoting *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)).

Once the plaintiff has made a *prima facie* case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [employment action that is challenged].'" *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *McDonnell Douglas*, 411 U.S. at 802). Once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court is left to determine whether the plaintiff has put forth enough evidence to defeat the defendant's proffer and support a

finding of discrimination. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008); *Woodruff*, 482 F.3d at 530.

At the summary judgment stage, courts may consider plaintiff's *prima facie* case, evidence presented by the plaintiff to rebut the employer's explanations for actions taken, and any additional evidence of discrimination that the plaintiff might proffer. *See Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012); *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (noting that, to avoid summary judgment, a plaintiff need not submit evidence "over and above" that necessary to rebut the employer's stated reason (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)) (internal quotation marks omitted)). A plaintiff's disagreement with or disbelief in an employer's explanation cannot alone "satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 58 (D.D.C. 2015). Rather, the plaintiff must put forward enough evidence that "a reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." *Id.* (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)) (internal quotation marks omitted).

### 2. Plaintiff Adequately Rebuts Defendant's Articulated Rationale for Adverse Employment Actions

"The record contains no direct evidence of discrimination—for example, a statement that itself shows [age or] racial . . . bias in the decision—that would generally entitle a plaintiff to a jury trial." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Plaintiff raises only one instance of a direct reference to his age, and no such instances referring to his race. Dep. of Paul Hicks at 61-63, Pl.'s Ex. E, ECF No. 33-10. In his deposition, Plaintiff commented that Mr. King, Plaintiff's intermediate supervisor in the OIG, "made comments to my receiving social

security and having bags of money because of my double retirement on more than one occasion."

*Id.* at 62:6-8.  Neither Plaintiff nor Defendant provides any further context to these conversations.

Without more, the "bags of money" comments are not enough to qualify as direct evidence of age discrimination.  "Direct evidence does not include stray remarks in the workplace, particularly those made by non-decision makers or statements made by decision makers unrelated to the decisional process itself." *Steele v. Carter*, 192 F. Supp. 3d 151, 165 (D.D.C. 2016) (quoting *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000), *aff'd* 298 F.3d 989 (D.C. Cir. 2002)), *aff'd in part*, *appeal denied in part sub nom. Steele v. Mattis*, No. 16-5236, 2017 WL 2332608 (D.C. Cir. Feb. 21, 2017); *see also* Reply Mem. at 16 (same).  Whether or not Mr. King could be considered a decision maker, Plaintiff does not claim that the "bags of money" comments specifically pertained to Defendant's decision to revoke his AWS privileges or terminate his employment.  Yet, the Court certainly considers such comments in deciding whether there is a genuine dispute as to the material facts supporting Plaintiff's age discrimination claim.[11]  *See Steele*, 192 F. Supp. 3d at 165 (citing *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016) (urging consideration of "isolated race-based remark" together with other evidence)).

Because there is no direct evidence in support of Plaintiff's age and race discrimination claims, the Court shall turn to circumstantial evidence.  That inquiry invites the burden-shifting analysis under *McDonnell Douglas*.  Plaintiff is an African American who was 66-years-old at the time of his termination.  Pl.'s Aff., ECF No. 33-4, ¶¶ 1-2; Pl.'s Ex. K, ECF No. 33-16, at 1.  There

---

[11] The parties do not press Plaintiff's claim, in his deposition, that Mr. King "relied on Caucasian directors more than African-American[] ones," insofar as he would say that he would double-check information from Plaintiff with another (white) source.  Dep. of Paul Hicks at 52:13-22, 53:1-12, Pl.'s Ex. E, ECF No. 33-10.  This is one of those pieces of evidence that is not direct, but further supports the Court's ultimate finding of factual issues for the jury on Plaintiff's racial discrimination claim.

is no dispute that he falls within protected classes under Title VII and the ADEA. *See, e.g.*, *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005) (recognizing African American as member of Title VII protected class); 29 U.S.C. § 631(a) (2016) (establishing 40 years of age as threshold for ADEA protections).

Plaintiff experienced two instances of what could be considered adverse employment actions, namely the revocation of his AWS privileges on May 16, 2014, and his termination on July 31, 2014, effective August 15, 2014. Def.'s Initial Stmt. ¶¶ 11, 22; Pl.'s Stmt. ¶¶ 11, 22; Def.'s Ex. 9, ECF No. 32-4, at 013. In this Circuit, "adverse employment action" is defined for purposes of Title VII as "a significant change in employment status, such as hiring, *firing*, failing to promote, reassignment with significantly different responsibilities, or *a decision causing significant change in benefits*." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (emphasis added) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)) (internal quotation marks omitted). In the absence of dispute, the Court shall assume, *arguendo*, that the revocation of Plaintiff's AWS privileges is a significant change in employment status, akin to a decision causing a significant change in benefits.

The only disputed element of Plaintiff's *prima facie* case is any causal connection between Defendant's adverse employment actions and Plaintiff's status as a member of protected classes under Title VII and/or the ADEA. At this summary judgment stage, the Court "'need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*,' where (1) 'an employee has suffered an adverse employment action,' and (2) 'an employer has asserted a legitimate, non-discriminatory reason for the decision.'" *Burton*, 153 F. Supp. 3d at 57 (quoting *Brady*, 520 F.3d at 494). Accordingly, bearing in mind the adverse

employment actions described above, the Court shall turn directly to Defendant's alleged rationale for those actions.

The parties go to some lengths in detailing their disagreement over Plaintiff's performance. The Court shall focus here on the highlights. Defendant justifies its adverse employment actions by pointing to evidence tending to suggest that Plaintiff's audit reports were not produced in a timely fashion, *see, e.g.*, Def.'s Ex. 3, ECF No. 32-4, at 046 (performance review stating "[Plaintiff's] written products have taken an extremely long period of time for the reports to be finalized.");[12] he failed to supervise an employee to the point that she did nothing for two years, Dep. of Ronald W. King at 130:16-21, 131:1-21, Pl.'s Ex. F, ECF No. 33-11 ("[I]t was implied to me that she was working and, later on, it was found out that she was not doing anything for two years."); and he failed to review his draft reports in Team Mate, an internal system for managing drafts of audit reports, *see* Dep. of Paul Hicks at 39:17-22, 40:1-20, Def.'s Ex. 7, ECF No. 32-4 ("[W]ith the exception of Medicaid state plan, I reviewed my audits in Team Aid [sic].").[13] Plaintiff challenges each point, identifying evidence that the other audit directors also were delayed in producing their reports and that different types of audits take different amounts of time, *see, e.g.*, Dep. of Roy Simmons at 46:2-21, Pl.'s Ex. R, ECF No. 33-23 (describing differing lengths of time by size and complexity of audit, and an average period that at one point was approximately 15 months and at another was approximately 30 months); Pl.'s Ex. aa, ECF No. 33-32, at 04119 (performance review of another supervisory auditor indicating that "she is not timely with her

---

[12] Plaintiff denies this assertion in the annual performance review, but he admits to receiving, reviewing, and signing the annual performance review containing this assertion. Pl.'s Stmt. ¶¶ 4, 10.

[13] Although Defendant makes a blanket assertion as to Plaintiff's non-use of Team Mate, the only evidence Defendant cites in its Statement of Undisputed Facts is this assertion by Plaintiff that he did use Team Mate for all except one report. *See* Def.'s Initial Stmt. ¶ 21.

products and could better manage her people, projects, and time"); he did supervise the relevant employee, who did in fact work during that time period at issue, Dep. of Paul Hicks at 36:3-22, 37:1, Def.'s Ex. 7, ECF No. 32-4 (describing the employee's role doing research and data mining); Dep. of Roy Simmons at 66:8-16, Pl.'s Ex. R, ECF No. 33-23 (confirming Plaintiff's supervision of the relevant employee); and although he admittedly did not use Team Mate for one of his audit reports, the Medicaid State Plan/Program Integrity audit, it was not loaded in Team Mate, he reviewed that report in paper form anyway, and other audit directors allegedly were not fully compliant in their Team Mate usage either, *see, e.g.*, Dep. of Paul Hicks at 40:15-22, 41:1-12, Pl.'s Ex. E, ECF No. 33-10 (affirming review of this report in paper format); *id.* at 38:16-19, 39:12-14 ("Q. Ms. Loudin was accused of refusing to use Team Aid [sic] and poorly supervising subordinates? A. That is what I know firsthand."); Dep. of Roy Simmons at 35:15-22, 36:1, Pl.'s Ex. R, ECF No. 33-23 ("It was a problem for all directors to, in a timely manner, review work papers" in Team Mate.). The Court also observes evidence in the record that the employee whom Defendant says did no work for two years remained employed at OIG for years after Plaintiff's termination. *See* Dep. of Roy Simmons at 65:4-21, 66:1-7 (stating unequivocally in 2017 deposition that "[s]he still currently works there").

Other evidence as well tends to show that Defendant's performance rationale fails to account for certain key facts. In particular, the performance reviews Plaintiff did receive included significant amounts of positive feedback. His 2011-2012 annual performance review shows that he received an overall rating in the "Competencies" section of 4.40/5.00,[14] making him a "4 Highly

---

[14] Plaintiff has not submitted the entirety of the 2011-2012 annual review. Even reviewing only the "Competencies" section, however, shows consistently higher ratings than in 2012-2013, when his "Competency" section earned an overall rating of 3.30. Def.'s Ex. 3, ECF No. 32-4, at 047.

Effective Performer," and in some specific areas, "5 Role Model." *See* Pl.'s Ex. B, ECF No. 33-7, at 039-041. While Defendant points to constructive criticism in the 2012-2013 review, that review contains primarily positive feedback, together with the overall finding that he is considered a "3 Valued Performer." *See* Def.'s Ex. 3, ECF No. 32-4, at 11-17. Notwithstanding any mixed message that a rating of three on a five point scale may suggest, elsewhere Defendant defines a rating of "Valued Performer" as showing that the individual "consistently meet[s] and may occasionally exceed expectations, and therefore, meets the minimum requirements of the position. Contributions are essential to ensuring that agency goals are met." Pl.'s Ex. A., ECF No. 33-6, at 14-I-3.

As for other would-be indicators of performance, Plaintiff disputes that he ever received an "unsatisfactory" midterm review to which Mr. King referred in his May 16, 2014, memorandum revoking Plaintiff's AWS privileges. *See* Dep. of Paul Hicks at 16:8-15, 18:9-12, Pl.'s Ex. E, ECF No. 33-10; Def.'s Ex. 5, ECF No. 32-4, at 24. Plaintiff's 2012-2013 annual review that he looked at nearly six months beforehand could not have been what Mr. King was referring to, because that annual report noted that the mid-term review for that period expressly found Plaintiff's performance to be "satisfactory" at that point. *See* Pl.'s Stmt. ¶¶ 5, 11; Def.'s Ex. 4, ECF No. 32-4, at 041. He also testifies that he was not placed on a performance improvement plan ("PIP"). Dep. of Paul Hicks at 13:21-22, 14:1-6, Pl.'s Ex. E, ECF No. 33-10. The parties dispute whether D.C. regulations require that an employee in the Management Supervisory Service was entitled to a PIP, *see* Opp'n Mem. at 18, Reply Mem. at 16 n.2;[15] the Court's reading of a District Personnel

---

[15] Mr. King says in his deposition that Plaintiff "was put on a performance improvement plan, a PIP plan, and some of those concerns were addressed in that PIP plan." Dep. of Ronald W. King at 48:11-19, Pl.'s Ex. F, ECF No. 33-11. Defendant appears not to find this testimony credible enough to argue that Plaintiff was placed on a PIP.

Manual submitted by Plaintiff suggests that his view is at least plausible, *see* Pl.'s Ex. A, ECF No. 6, §§ 1410.1(f), 1410. Plaintiff's assembly of this evidence regarding performance feedback appears to show a rather rapid fall from grace that a reasonable jury could find, together with Plaintiff's direct rebuttal, is not fully explained by the type and timeline of performance issues that Defendant has identified.

Defendant argues that Plaintiff's self-serving testimony is not enough to create a genuine issue of fact. Reply Mem. at 7 (citing *Ward v. District of Columbia*, 950 F. Supp. 2d 9, 17 (D.D.C. 2013)). But the Court finds more than only Plaintiff's word in most instances, and in any event, Defendant sometimes puts forth no more than the near-equivalent of its own word, by deposition of its past employee, Mr. King, and its own written documents.

As discussed above, it is not enough that Plaintiff attack Defendant's rationale. His effort to show that rationale to be pretext also must warrant the consideration of a reasonable jury. *See Burton*, 153 F. Supp. 3d at 58. Plaintiff makes his case for age and racial discrimination by identifying comparators, namely other supervisory auditors who were working contemporaneously at OIG but who differed in age and, in one instance, race. Of the four comparators that Plaintiff identifies, all are at least sixteen years younger, three of whom are African American or African,[16] and one of whom is white.[17] Opp'n Mem. at 9-10. Plaintiff also draws on the experience of his predecessor as Director of Medicaid Audits, who is white and approximately thirteen years younger than him. *Id.* at 15. Defendant disputes the extent to which these other supervisory

---

[16] Neither party distinguishes between African American and African for purposes of identifying comparators.

[17] The fact that purported comparators also were members of either the Title VII or ADEA protected classes does not prohibit Plaintiff from contrasting his characteristics with theirs. *See O'Connor*, 517 U.S. at 312 (finding that replacement of 56-year-old employee with 40-year-old employee likewise within ADEA protected class did not invalidate fired employee's attempt to make out *prima facie* case).

auditors are true comparators, *see generally* Reply Mem. at 9-17, arguing, for example, that their audit reports were not as delayed as Plaintiff's and cannot easily be compared anyway, *id.* at 9-12. The difficulty comparing those audit reports, due in Defendant's words to the "many variables affect[ing] how long each report will take," *id.* at 10, is among the factual issues that are appropriate for the fact finder, not for the Court at this summary judgment stage.

Viewing the facts in the light most favorable to the Plaintiff, there are genuine disputes as to the assessment of Plaintiff's performance vis-à-vis other supervisory auditors, and the extent to which other supervisory auditors are sufficiently comparable for purposes of age and racial discrimination claims. This is a situation in which some of the material facts (e.g., audit report timeliness) are in dispute, and other undisputed facts (e.g., failure to use Team Mate for one report) are susceptible to divergent yet justifiable inferences. *See Moore*, 571 F.3d at 66. The jury must find the remaining facts and elect among the justifiable inferences.

If the Court were not convinced by the disputes outlined above, it is Defendant's silence regarding Roy Simmons that raises a further dispute of material fact sufficient to warrant denying its motion for summary judgment on the age and racial discrimination claims.[18] Mr. Simmons, an African American in his sixties, is the one supervisory auditor who also fell within both of Plaintiff's protected classes. *See* Dep. of Ronald W. King at 14:17-21, 15:1-3, Pl.'s Ex. F, ECF No. 33-11; Pl.'s Ex. L, ECF No. 33-17, at 4321. Approximately one year after Plaintiff's termination, Mr. Simmons too was terminated. Pl.'s Ex. L, ECF No. 33-17, at 04321. OIG's internal memoranda show that Defendant's rationale was similarly the timeliness of an audit and supervision of staff. *See id.* at 04309-04310. But this time the record also includes evidence that

---

[18] Defendant mentions Mr. Simmons only as part of its quotation of a meeting summary. *See* Summ. Chart of Material Facts, ECF No. 34-1, at 8. That reference is not relevant for present purposes.

a supervisor of Mr. Simmons objected to the recommendation to terminate him, expressly questioning the basis for the decision made by more senior leadership. *Id.* at 04314-04315 (asking, e.g., "Will we hold other audit directors, audit staff, and ourselves to the same standard of accountability we are now holding Roy to?"). The record reflects that Blanche Bruce, the then-Deputy Inspector General, did not respond substantively to the objector, rather insisting that he "simply" indicate whether he agrees or disagrees. *See id.* at 04314 (identifying further response as "disagree"). And Mr. Simmons himself did not know why he was let go, indicating only "I had 15 minutes to leave. That was it. Fifteen minutes. No conversation." *See* Dep. of Roy Simmons at 68:14-21, 69:1-18, Pl.'s Ex. R, ECF No. 33-23. In light of the summary dismissal of Mr. Simmons, another protected class member, on similar grounds to those of Plaintiff, and given that Defendant does not respond to any of this evidence, the Court finds that the jury must determine the inferences to be drawn for Plaintiff's claims.

### B. Claim Under the District of Columbia Whistleblower Protection Act

Pursuant to D.C. Code § 1–615.54(b) (2017), a plaintiff alleging retaliation in violation of the DCWPA has the initial burden of establishing by a preponderance of the evidence that a protected activity was a contributing factor in an allegedly prohibited personnel action; only then does the burden shift to the employer to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate reasons even absent the protected activity. *See also Crawford v. District of Columbia*, 891 A.2d 216, 218-19 (D.C. 2006). "Prohibited personnel actions" include, *inter alia*, termination and retaliation in "any other manner," D.C. Code § 1–615.52 (2017), the latter of which the Court shall assume, *arguendo*, encompasses the revocation of AWS privileges in this case.

The Court shall evaluate Plaintiff's argument that he engaged in protected activity and that this activity was a contributing factor in the revocation of his AWS privileges and his termination.

1. Plaintiff Has Not Established That He Made Protected Disclosures Regarding the Payment Non-Suspension Issue

Plaintiff argues that his disclosures qualify as protected activity under the DCWPA. The DCWPA prohibits, in relevant part, a supervisor from "tak[ing], or threaten[ing] to take, a prohibited personnel action or otherwise retaliat[ing] against an employee because of the employee's protected disclosure." D.C. Code § 1–615.53 (2017). A "protected disclosure" is statutorily defined as:

> any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E) A substantial and specific danger to the public health and safety.

*Id.* § 1–615.52(a)(6).

The District of Columbia Court of Appeals has explained that "[a] 'protected disclosure' under the DC–WPA is one that the employee 'reasonably believes' evidences one or more of the circumstances delineated in D.C. Code § 1–615.52(6)(A)-(E) (2001)." *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008). The "employee must disclose such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people." *Id.*

(quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)) (internal quotation marks omitted). To determine whether an individual reasonably believed that such errors constituted gross misconduct or abuse or were illegal, a court must consider whether "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence [illegality, gross abuse, etc.]." *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-60 (D.C. 2003) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)) (internal quotation marks omitted). "A purely subjective perspective of an employee is not sufficient even if shared by other employees." *Id.* (internal quotation marks omitted). The key inquiry remains whether the plaintiff reasonably believed the conduct disclosed was illegal or a gross abuse, for example, and not whether the conduct was in fact ultimately found to be illegal or a gross abuse. *See id.*

Record evidence relevant to the protected disclosure inquiry can be succinctly summarized as follows. Beginning as early as April 2013 and continuing through at least April 2014, Plaintiff spoke with his superiors at OIG on a number of occasions regarding the "finding" that certain payments to healthcare providers had not been suspended. *See* Pl.'s Stmt. ¶¶ 29-35; Def.'s Reply Stmt. ¶¶ 29-35. On various of these occasions, he specifically discussed his further belief that the finding should be included in his audit report, a point which his superiors, in particular Mr. King, resisted. *See* Pl.'s Stmt. ¶¶ 29, 31-35; Def.'s Reply Stmt. ¶¶ 29, 31-35.

The record casts doubt, however, on Plaintiff's apparent presumption that he was disclosing something that was previously unknown. As a result, it would not be appropriate to refer to the payment non-suspension issue as a "finding," and, critically, his activities may not qualify as a "disclosure." "District of Columbia case law suggests that a plaintiff's statements do not qualify as 'protected disclosures' under the [DC]WPA if the statements conveyed only information that

was already known to the person to whom the information is reported . . . ." *Williams v. Johnson*, 701 F. Supp. 2d 1, 15 (D.D.C. 2010) (citing *Wilburn*, 957 A.2d at 925-26)). At first blush, it is not entirely clear in the briefing whether the "disclosure" at issue is the underlying "finding" of payment non-suspension, or instead the issue of whether that "finding" must be included in the audit report. The parties seem to suggest that it is the latter, *see* Opp'n Mem. at 22-24; Reply Mem. at 20, but the Court shall address each possibility in turn.

There is at least one sign in the record that upper-level management may already have been aware of the underlying payment non-suspension issue when Plaintiff discussed it with them in April 2013. In the IG's December 13, 2013, letter to the Director of DHCF, Mr. Willoughby observed that

> DHCF's failure to suspend providers it has referred to the MFCU is of concern especially because the CMS Comprehensive Program Integrity Review Draft Report (*January 2013*) found the District's Medicaid program "at significant risk due to vulnerabilities in its program integrity activities," including "inadequate attention to fraud and abuse detection, including failing to suspend $59 million in payments for providers referred to the Medicaid Fraud Control Unit (MFCU) for investigation . . . ."

Def.'s Ex. 13, ECF No. 32-4, at 3 (emphasis added). Neither party attempts to explain the origin or import of this January 2013 report to which Mr. Willoughby refers. For example, it is not clear whether OIG produced the January 2013 report, and regardless, whether OIG's upper-level management was aware of this report and its findings by the time that Plaintiff was discussing his "findings" with his superiors beginning in April 2013. The existence of such a report, however, makes it more difficult for Plaintiff to discharge his burden that the payment non-suspension issue was a "disclosure."

As for the other possible "disclosure," it is not clear that Plaintiff's superiors were previously unaware of the regulations that Plaintiff discussed with them, or of the implications of those regulations. According to Plaintiff, he brought two regulations to Mr. King's attention,

namely the GAO's Government Auditing Standards and 42 C.F.R. § 455.23. Pl.'s Stmt. ¶ 35.

Defendant admits that Plaintiff "told his supervisors that he believed that federal regulations and

accounting standards required" disclosure in the audit report. Def.'s Reply Stmt. ¶ 35. Surely

OIG upper-level management already was familiar with GAO standards intended for auditors;

Plaintiff says nothing to dispel that assumption. The specific portions of the GAO standards cited

by Plaintiff are too general to support any notion of a revelation to management that he was "duty-

bound" to include the payment non-suspension issue in his report. *See* Opp'n Mem. at 23-24

(asserting that inclusion of the payment non-suspension issue is part of the "objective analysis"

called for by GAO standards); Pl.'s Ex. P, ECF No. 33-21, at 2 (GAO Government Auditing

Standards excerpt).[19]

The C.F.R. section cited by Plaintiff sets forth the substantive requirement that Medicaid

payments be suspended to providers under investigation, absent good cause:

> The State Medicaid agency must suspend all Medicaid payments to a provider after
> the agency determines there is a credible allegation of fraud for which an
> investigation is pending under the Medicaid program against an individual or entity
> unless the agency has good cause to not suspend payments or to suspend payment
> only in part.

42 C.F.R. § 455.23(a)(1) (2017). But this section says nothing about including any findings to the

contrary in an auditor's report. Here too, Plaintiff has not carried his burden to show that the need

to include the payment non-suspension issue in his report was a "disclosure" for DCWPA purposes.

Even if Plaintiff did make a "disclosure" in one or both of the above respects, he would not

be able to carry his burden to prove either is "protected." Here the objective reasonableness

---

[19] This excerpt of the Government Auditing Standards also states that "[a]uditors should not
perform review-level work for reporting on internal control or compliance with provisions of laws
and regulations." Pl.'s Ex. P, ECF No. 33-21, at 2. Plaintiff's efforts appear to cut against GAO
standards in this respect. But because this excerpt does not include all of the relevant context, the
Court shall not rely on this point.

standard in *Wilburn* and *Zirkle* comes into play. In light of all the evidence, Defendant's failure to suspend payments to all Medicaid providers under investigation is, if an error at all, not an error so serious as to be "not debatable among reasonable people." *See Wilburn*, 957 A.2d at 925. Plaintiff's disclosure of this point to superiors at OIG did not account for colorable good cause bases for Defendant's not suspending the payments, even though Plaintiff disputes those good cause bases. *See* Def.'s Mot. at 26 (describing, in FCA/DCFA context, the law enforcement exception and the administrative overturning of some suspensions as good cause bases for non-suspension); Opp'n Mem. at 20-21 (disputing law enforcement exception); Def.'s Ex. 13, ECF No. 32-4, at 0483 (discussing rescission of some suspensions); Reply Mem. at 18-19 (proffering other good cause bases that Plaintiff arguably would have to address). Nor does Defendant's decision not to disclose the payment non-suspension issue in the Medicaid State Plan/Program Integrity audit report rise to the level of such seriousness, where there is no standard clearly requiring such a disclosure there. The record reflects that Defendant's OIG handled the payment non-suspension issue with a letter from the IG to DHCF that evidences interagency communication between DHCF and MFCU about the payment non-suspension issue. Defendant could have discharged its obligation to comply with 42 C.F.R. § 455.23 through internal means such as this without discussing the issue in the report.

It is true that Plaintiff may not have been aware of all the good cause arguments for non-suspension of the payments at issue. He also may not have been aware of the IG's letter to DHCF. Given the possible limits of Plaintiff's knowledge at the time, perhaps "a disinterested observer with knowledge of the essential facts known to and readily ascertainable by [Plaintiff] [could have] reasonably conclude[d] that the actions of the government evidence[d] [illegality]." *See Zirkle*, 830 A.2d at 1259-60 (quoting *Lachance*, 174 F.3d at 1381) (internal quotation marks omitted). For

this reason, the Court hesitates to find that he did not satisfy the objective reasonableness standard for believing that he disclosed unlawful activity. The Court accordingly shall proceed to the next prong of the DCWPA analysis.

   2. Plaintiff Has Not Established the Causal Inference Between Any Protected Disclosures
      Regarding the Payment Non-Suspension Issue and Alleged Retaliation

If Plaintiff could establish that he made a disclosure, and that it was protected, he would also need to prove that it was at least a contributing factor in the revocation of his AWS privileges and his termination. *See* D.C. Code § 1–615.54(b). The lapse of time between Plaintiff's April 2013 discussion of the payment non-suspension issue and its place in his audit report, on the one hand, and the eventual revocation of his AWS privileges in May 2014 and termination in July 2014, on the other hand, is simply too long to support a causal inference. But Circuit precedent instructs the Court also to "consider later protected activity in determining whether evidence of temporal proximity satisfies the causation element." *Hamilton*, 666 F.3d at 1357-58 (applying this standard in retaliation case under federal Civil Service Reform Act). In *Hamilton*, that interval was a little less than three months between the later instance of protected activity and the adverse employment action. *Id.* at 1358. More conservatively here, the interval is only one or two months between the last record evidence of Plaintiff's raising the payment non-suspension issue and audit report on March 11, 2014, and April 10, 2014, and the revocation of his AWS privileges on May 16, 2014. Pl.'s Stmt. ¶¶ 11, 33, 34; Def.'s Reply Stmt. ¶¶ 11, 33, 34.

The legal possibility of temporal proximity notwithstanding, the Court is not precluded from evaluating the temporal proximity in light of all the evidence. *See Hamilton*, 666 F.3d at 1358 ("[W]e have evaluated the specific facts of each case to determine whether inferring causation is appropriate."); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (finding, in Title VII suit, "an inference of retaliatory motive based upon the 'mere proximity' in time between

[plaintiff's] filing her first suit and the [adverse employment action] two and one-half months later would be untenable on the record here"). In light of Plaintiff's year-long series of comments on the payment non-suspension issue and its place in the audit, these last few occurrences one or two months ahead of the first alleged retaliation are not sufficiently persuasive to establish the inference in the absence of direct evidence.

***

The Court finds that Plaintiff has not carried his burden to prove by a preponderance of the evidence that he engaged in protected activity with respect to the payment non-suspension issue and the Medicaid State Plan/Program Integrity report, and that such activity was a contributing factor in a prohibited personnel action.

### 3. Plaintiff Has Not Established That He Made Protected Disclosures Regarding Nursing Home Deficiencies Nor Can Any Causal Inference Be Drawn Therefrom

Plaintiff makes a similar retaliation argument about disclosures that he allegedly made in his draft of the Nursing Home Performance and Administrative Salaries audit report, which he refers to as the "Nursing Home Performance Audit" report. The record evidence in support of Plaintiff's *prima facie* case for this claim consists substantially of the following three paragraphs in his affidavit:

> In my draft Nursing Home Performance Audit report, I discussed D.C. nursing facilities' poor-quality care and internal control deficiencies. I reasonably believed that this information evidenced a violation of healthcare laws and regulations.

> Prior to my submission of the draft Nursing Home Performance Audit report, Mr. King attempted to suppress my findings: that (1) D.C. nursing facilities lacked internal control programs that would prevent and detect waste, fraud, and abuse; and (2) D.C. nursing facilities provided poor-quality of care.

> Contrary to Defendant's contention, the documentation gathered and fieldwork performed during the Nursing Home Performance Audit was adequate.

Pl.'s Aff., ECF No. 33-4, ¶¶ 25-27. The only one of these contentions that Plaintiff proposed as an undisputed fact is that he "discussed D.C. nursing facilities' poor-quality care and internal control deficiencies" in his draft report. Pl.'s Stmt. ¶ 41. Defendant disputed, arguing that "Plaintiff's post-deposition affidavit cannot create a genuine issue of fact. The draft report itself is the best evidence of its content." Def.'s Reply Stmt. ¶ 41; *see also* Reply Mem. at 21 (citing *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009). "Without some independent verification . . . [the] declaration is self-serving and uncorroborated. Such declarations are of little value at the summary judgment stage, and certainly do not represent concrete evidence . . . ." *Gen. Elec. Co.*, 595 F. Supp. 2d at 36 (citation omitted). The draft report is not in evidence.

Even if Plaintiff's affidavit alone were enough evidence, the Court finds that the alleged deficiencies described in the Nursing Home Performance and Administrative Salaries audit draft report are simply too vague to raise a triable issue of fact. That is the case whether the purported error on the part of Defendant, for DCWPA purposes, is the nursing homes' deficiencies themselves—which does not appear to be alleged—or the failure to include the nursing home deficiencies in his audit report. *See* Opp'n Mem. at 24. It is not clear, for example, how nursing homes allegedly fell short in their quality of care, and which "healthcare laws and regulations" that deficiency allegedly would contravene. As for the slightly more specific allegation about internal control programs, Plaintiff does not clarify what kind of program would be required by law and which laws would be invoked. At this point, after close of discovery, Plaintiff could only survive summary judgment if he had more specific evidence to support his thin allegations of a protected disclosure of alleged nursing home deficiencies. *See, e.g.*, *Ricci*, 557 U.S. at 586 (specific facts necessary); *Greene*, 164 F.3d at 675 (conclusory allegations insufficient).

Absent greater specificity, the Court is inclined to believe that Plaintiff's allegations here are akin to his misplaced allegations regarding GAO's auditing standards and the payment suspension portion of the C.F.R. In short, a standard (e.g., the GAO's) or a substantive rule (e.g., in the C.F.R.) may be established, but a specific venue for addressing the issue at hand—e.g., in his respective audit report—is not expressly dictated, contrary to Plaintiff's assertions.

Plaintiff again tries to establish causation by pointing to temporal proximity. The parties agree that Plaintiff's Nursing Home Performance and Administrative Salaries draft report was submitted sometime on or before July 22, 2014; OIG cancelled that report on July 24, 2014; and he was terminated on July 31, 2014. Def.'s Initial Stmt. ¶ 22; Pl.'s Stmt. ¶¶ 40, 42. If the facts were sufficient to establish a protected disclosure, then the timing could support an inference of causation so as to survive summary judgment. But without a protected disclosure, proximity alone is not enough.

The Court finds that Plaintiff has failed to carry his burden to establish a *prima facie* case with respect to the Nursing Home Performance and Administrative Salaries audit report.

### C. Claims Under the Federal False Claims Act and the District of Columbia False Claims Act

Plaintiff's retaliation claims under the federal FCA and DCFCA must trace a different statutory scheme but ultimately fare similarly to his DCWPA claim.

#### 1. Analytical Framework for Federal FCA and DCFCA Claims

In an effort to distinguish the FCA claims from each other and from the DCWPA claim, the Court shall reiterate its treatment of the relevant statutory framework in its denial of Defendant's motion to dismiss the federal FCA and DCFCA claims. *See* Mem. Op. and Order, ECF No. 19, at 2-6.

### a. Federal False Claims Act

"Ordinarily under the FCA, 'the government, or a party suing on its behalf, may recover for false claims made by the defendant to secure a payment by the government.'"[20] *Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 63 n.1 (D.C. Cir. 2008) (quoting *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 652 (5th Cir. 2004)). However, "[i]n a *reverse* false claim action under . . . [Section 3729(a)(1)(G)], 'the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated.'"[21] *Id.* (quoting *Ga. Gulf Corp.*, 386 F.3d at 653). Specifically, the federal FCA establishes liability for any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G) (2016). The federal FCA, as amended in 2009, defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3). Subject to exceptions not relevant here, a person liable under these provisions is liable to the United States Government for a civil penalty "plus 3 times the amount of damages which the Government sustains because of the act of that person." *Id.* § 3129(a)(1).

---

[20] In 2009, Congress amended the False Claims Act, and the relevant provisions were re-numbered. *See Pencheng Si v. Laogai Research Foundation*, 71 F. Supp. 3d 73, 86 (D.D.C. 2014); *id.* at 88-89 (describing 2009 changes to the reverse false claim provisions).

[21] The reverse false claim provision is the only substantive provision of the FCA at issue in this case. *See* Def.'s Mot. at 22; Opp'n Mem. at 19-20 (citing and describing the reverse false claim provision and the retaliation provision).

When the Court previously denied Defendant's attempt to dismiss the federal FCA claim, the Court found that Defendant's arguments were premised on an outdated version of the federal statute. *See* Mem. Op. and Order, ECF No. 19, at 12. In its latest motion, Defendant correctly cites the amended version of this statute utilizing the above-described revised definition of the term "obligation." *See* Def.'s Mot. at 24, 27. The practical effect of the amendment was to "broaden the meaning of 'obligation' with respect to reverse false claims." Mem. Op. and Order, ECF No. 19, at 12.

Finally, the federal FCA allows retaliation claims in connection with other provisions of the Act:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of *lawful acts* done by the employee, contractor, agent or associated others *in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter*.

31 U.S.C. § 3730(h)(1) (2016) (emphasis added). In other words, the FCA creates a retaliation claim in circumstances where, in addition to satisfying other criteria, a person suffers retaliation as a result of "lawful acts . . . in furtherance of an action under this section *or* other efforts to stop 1 or more violations of this subchapter." *Id.* (emphasis added).

The retaliation provision, which was first "added in 1986, was 'designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime.'" *United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) (citation omitted). Most significantly, the provision was amended in 2009 to add the final phrase in the provision, clarifying that a retaliation claim can be based on "other efforts to stop 1 or more violations of" the FCA. 31 U.S.C. § 3730(h)(1); *see Pencheng Si*, 71 F. Supp. 3d at 90 (describing version of retaliation provision prior to the 2009

amendments); Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111–21, § 4(a) & (d), 123 Stat. 1617, 1621-25 (amending retaliation provision).[22] These amendments significantly broadened the protection to whistleblowers under the federal FCA. *United States ex rel. Hansen v. Deming Hosp. Corp.*, 992 F. Supp. 2d 1137, 1163 (D.N.M. 2013).

### b. District of Columbia False Claims Act

The parties agree that the relevant provisions of the DCFCA are the same in all material respects as the provisions of the federal False Claims Act. *See* Def.'s Mot. at 23; Opp'n Mem. at 19 n.4 ("Retaliation claims under the FCA and the DCFCA have the same elements. Moreover, the anti-retaliation provisions of both Acts are nearly identical. Therefore, the arguments presented in the instant Memorandum are applicable to Plaintiff's FCA and DCFCA claims.") (citations omitted). "The elements of a DCFCA retaliation claim mirror, and are analyzed in a similar fashion to, a retaliation claim arising under the federal False Claims Act . . . ." *Campbell v. District of Columbia*, 972 F. Supp. 2d 38, 47 (D.D.C. 2013).[23] In addition, the District of Columbia Court of Appeals has stated that it is appropriate to look to federal cases interpreting the federal FCA "for guidance in interpreting the [DC]FCA." *Grayson v. AT & T Corp.*, 980 A.2d 1137, 1146 n.25 (D.C. 2009), *reh'g en banc granted, opinion vacated in part on other grounds*, 989 A.2d 709 (D.C. 2010),

---

[22] The provision was further amended in 2010 through the Dodd-Frank Act. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, § 1079A(c), 124 Stat. 1376, 2079 (amending retaliation provision).

[23] Amendments to the DCFCA that became effective on March 19, 2013, aligned the District of Columbia statute with the federal statute. *See* Medicaid Fraud Enforcement and Recovery Amendment Act of 2012, 2012 District of Columbia Laws 19-232 (Act 19-549), §2. Although certain background activities in this case occurred before the amendments took effect, the acts that form the actual basis of the retaliation claims subject to this motion occurred after the amendments became effective. Nor do the parties suggest anything to the contrary regarding the relevant statutory provisions.

and *on reh'g en banc*, *reissuing panel decision in part* 15 A.3d 219 (D.C. 2011); *Grayson v. AT & T Corp.*, 140 A.3d 1155, 1163 n.24 (D.C. 2011).

Bearing in mind the parallel nature of the two statutes, the Court now turns to the relevant provisions of the DCFCA.

The D.C. False Claims Act establishes civil liability for any person who

[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District[.]

D.C. Code. § 381.02(a)(6) (2017). This provision is identical to the reverse false claim provision of the federal False Claims Act, with the exception that the federal FCA pertains to obligations to pay or transmit money to the United States Government, while the DCFCA pertains to obligations to pay or transmit money to the District of Columbia. *Compare id.*, *with* 31 U.S.C. § 3729(a)(1)(G); *see also* Medicaid Fraud Enforcement and Recovery Amendment Act of 2012, 2012 District of Columbia Laws 19-232 (Act 19-549), § 2(c).

As discussed above in the federal FCA context, Defendant's motion to dismiss the DCFCA claim likewise was based on an outdated version of the D.C. statute. *See* Mem. Op. and Order, ECF No. 19, at 12-13. In its latest motion, Defendant correctly cites the amended version of this statute. *See* Def.'s Mot. at 26-27. The amended version contains the above-described revised definition of the term "obligation": "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." D.C. Code § 2-381.01(9) (2012). Again, the practical effect of the amendment was to "broaden the meaning of 'obligation' with respect to reverse false claims." Mem. Op. and Order, ECF No. 19, at 12.

Like the federal FCA, the DCFCA also includes retaliation claims in relation to the other substantive provisions of the statute:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment *because of lawful acts* done by the employee, contractor, agent, or associated others *in furtherance of an action under this subchapter or other efforts to stop one or more violations of this subchapter*.

D.C. Code § 2-381.04(a) (2017) (emphasis added). Just as with the substantive reverse false claim provision, the retaliation provision of the DCFCA, amended in 2013, is identical to the analogous federal provision. *Compare id.*, *with* 31 U.S.C. § 3730(h)(1); *see also* Medicaid Fraud Enforcement and Recovery Amendment Act of 2012, 2012 District of Columbia Laws 19-232 (Act 19-549), § 2(d). The Court notes, once again, that the DCFCA pertains to retaliation in connection with violations of that act and, therefore, pertains to reverse false claims in connection with the District of Columbia rather than with the United States Government.

***

A retaliation claim has "two basic elements": (1) protected activity by an employee and (2) "retaliation by the employer against the employee 'because of' those acts." *Schweizer*, 677 F.3d at 1237 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)). The parties have not argued that a retaliation claim is subject to different standards in this reverse context, nor is the Court aware of a reason to distinguish precedent from the traditional forward context. *See Hoyte*, 518 F.3d at 66 (articulating protected activity and causal inference factors in reverse FCA setting prior to 2009 changes).

As to the first element, "while the employee must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action, it is not necessary for a plaintiff to know that the investigation could lead to a False Claims Act suit." *Shekoyan v. Sibley Int'l*, 409

F.3d 414, 423 (D.C. Cir. 2005) (citations, internal quotation marks, and alterations omitted); *Schweizer*, 677 F.3d at 1238 ("In terms of § 3730(h), an employee can be acting 'in furtherance of an action under this section'—can be engaging in protected activity—although the employee . . . has no idea whether his—the employee's—investigation or other acts, if made known to the government, might cause the Attorney General to sue his employer under the False Claims Act."). Nonetheless, an FCA suit is not viable if it consists only of "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations. . . . To be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims." *Yesudian*, 153 F.3d at 740 (citations omitted). Furthermore, "[t]o establish the second element, the employee must demonstrate that the employer had knowledge of the employee's protected activity and that the retaliation was motivated by the protected activity." *Shekoyan*, 409 F.3d at 422.

"[P]laintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (internal quotation marks omitted). "While threatening . . . to make a report to the government clearly is one way to make an employer aware, it is not the only way, as when an employee acts outside her normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity . . . ." *Omwenga v. United Nations Found.*, 244 F. Supp. 3d 214, 218-20, 2017 WL 1154954, at *2 (D.D.C. 2017) (citations, internal quotation marks, and alterations omitted); *see also Schweizer*, 677 F.3d at 1239 (focusing

on actions that could alert employer of "reasonable possibility" of litigation, such as advising that employer hire counsel (internal quotation marks omitted)).

## 2. Plaintiff Has Not Established That He Engaged in Protected Activity Under the Federal FCA or DCFCA

For Plaintiff to prevail on his federal FCA and DCFCA retaliation claims, which are premised on a reverse theory of the FCA, he must establish that his advocacy for inclusion of the alleged violations in his audit reports constituted efforts to stop one or more violations of the respective FCA statutes. *See* 31 U.S.C. § 3730(h)(1); D.C. Code § 2-381.04(a). There is no evidence that Plaintiff sought to address the alleged violation of the C.F.R. with a view specifically towards the possibility of Defendant's liability under the reverse FCA. But such foresight is not necessary. Plaintiff need not have known at the time of his purported protected activity that his efforts were directed at preventing an FCA violation *per se*. *See Schweizer*, 677 F.3d at 1238; *Shekoyan*, 409 F.3d at 422.

But at this point, Plaintiff must be able to show that the action he was trying to stop was a violation of the FCA. Plaintiff argues that Defendant's failure to suspend payments to Medicaid providers who were under investigation was a violation of the FCA. *See* Opp'n Mem. at 21. "By wanting to include the 'suspended payments finding' in the Medicaid State Plan Audit report, Plaintiff made efforts to prevent Defendant from concealing an obligation to pay the U.S. Government" and "the D.C. Government." *Id.* Defendant's argument that it had good cause under 42 C.F.R. § 455.23(a)(1) for not suspending payments raises one reason why it might not have had such an obligation to pay the federal or D.C. governments. *See* Def.'s Mot. at 24-27; Reply Mem. at 17-19. Defendant offers two specific good cause reasons for non-suspension, and points out that Plaintiff has not made any effort to rebut other good cause arguments also available to Defendant. *See, e.g.*, Def.'s Mot. at 26; Reply Mem. at 18-19.

As to one of its good cause arguments, Defendant has described its initial efforts to suspend at least some payments. DHCF issued suspension letters that were challenged by providers who received them and ultimately reversed by administrative law judges who found those letters to be deficient or otherwise found the suspension unsupportable. *See, e.g.*, Def.'s Mot. at 26; Dep. of Karen Shaw at 38:10-21, 39:1-21, 40:1-21, 41:1-21, 42:1-13, Def.'s Ex. 11, ECF No. 32-4; Def.'s Ex. 12, ECF No. 32-4 (containing administrative case reversing suspension due to deficient letter); Def.'s Ex. 13, No. 32-4, at 0483 (conveying IG's summary of this issue to DHCF director). Whether and how Defendant pursued those suspensions any further is not in the record. Whether Defendant should have pursued further seems to be beyond the scope of an inquiry that is focused on a finding of "false or fraudulent" activity of Defendant. *See Yesudian*, 153 F.3d at 740. If at first DHCF did not succeed in suspending payments to those to whom it sent deficient or otherwise unsupportable letters, it appears not to be a matter of falsehood or fraud not to "try, try again." Nor does Plaintiff argue it should be.

Defendant's other proffered good cause was an ongoing investigation by law enforcement. Def.'s Mot. at 26 (citing 42 C.F.R. § 455.23(e)(1)). MFCU specifically requested that DHCF not suspend payments to certain providers for fear that it would tip them off to an investigation. *See id.*; Dep. of Karen Shaw at 69:10-21, 70:1-21, 71:1-12, Def.'s Ex. 11, ECF No. 32-4 (describing investigation into home health agencies). Plaintiff's response is not entirely coherent, but appears to argue that this good cause rationale is only manufactured *ex post* and that it did not apply to all instances of non-suspension. *See* Opp'n Mem. at 20-21; Pl.'s Stmt. ¶ 25. Yet, Plaintiff has not identified any authority for the notion that Defendant must have labeled its efforts with a good cause exception at the time. And no one is arguing this good cause basis applies to all instances in which Defendant did not suspend payment.

Responding more generally to Defendant's asserted good cause, Plaintiff argues that Defendant has not attempted to offer a good cause basis for non-suspension of payments to *each and every* provider who is at issue. "Defendant, without offering any evidentiary support, has assumed that the millions of dollars in D.C. Medicaid payments paid out to all the medical providers who were referred to Defendant's MFCU at issue was [sic] justified." Opp'n Mem. at 20 (emphasis omitted). Although the record is not entirely clear on this point, Defendant seems to admit that it did not pursue every last provider. *See* Dep. of Karen Shaw at 40:9-13, Def.'s Ex. 11, ECF No. 32-4 ("So we [DHCF] worked through the problem of the letters being legally deficient and we sent out letters. But we did not send out letters every time we referred a case to [MFCU].").

But even at this point, after the close of discovery, the full list of providers who were subject to investigation is not before the Court. If that list were before the Court, then the Court could entertain line-by-line arguments as to the sufficiency of good cause arguments for not suspending payments to this or that provider. Absent that list, the Court in its discretion shall rule on good cause arguments put forward as to the class of providers under investigation. As observed above, Plaintiff forewent his opportunity to rebut other possible good cause arguments that Defendant suggests could apply to providers whose payments were not suspended.

Even if Defendant lacked good cause not to suspend payments to one or more providers under 42 C.F.R. § 455.23(a)(1), Plaintiff appears to be reporting on "nothing more than his employer's non-compliance with federal or state regulations," which is not enough to sustain an FCA claim. *See Yesudian*, 153 F.3d at 740. For example, one reading of the mandatory nature of the C.F.R. provision could obligate DHCF to issue a fresh round of letters to those whose deficient letters were struck by the administrative law judge. If it did not do so, then, on this reading of the C.F.R., it would not be in compliance with federal regulations. But that is not enough for a

violation that could sustain an FCA claim. Rather, as noted above, what is necessary is some evidence of "false or fraudulent" claims. *See id.* Plaintiff has not produced any evidence that Defendant's DHCF falsely or fraudulently sought Medicaid funds from the federal government and/or from the District's general fund in order to pay providers under investigation.

It is a particularly steep challenge for Plaintiff to prove that he engaged in protected activity because his efforts to raise an issue with his superiors appear to be part of his normal job responsibilities. For example, the OIG's Audit Handbook defines a "performance audit" as "an objective and systematic examination of evidence for the purpose of providing an independent assessment of the performance of a government organization, program, activity, or function in order to provide information to improve public accountability and facilitate decision-making by parties with responsibility to oversee or initiate corrective action." Pl.'s Ex. Q, ECF No. 33-22, at 37 (citation omitted). Plaintiff did his job of examining the evidence of payments to Medicaid providers, rendering his independent assessment (as a non-lawyer) that DHCF was violating the law, and facilitating decision-making by his superiors in OIG as to appropriate corrective action. As the Court already has stated in this Memorandum Opinion, Plaintiff points to no evidence that this assessment need have been made in the audit report itself, nor that Plaintiff's superiors would be violating a rule by excluding his assessment from that report.

At no point in the record did Plaintiff clearly signal to his employer that he was engaging in protected activity rather than engaging in his normal job responsibilities as an auditor. *See Martin-Baker Aircraft Co., Ltd.*, 389 F.3d at 1261. He did not, for example, appear to act outside his normal job responsibilities, threaten that he would report the payment non-suspension issue to the federal government or to the D.C. general fund, or suggest that OIG should hire counsel to defend its actions. *See Schweizer*, 677 F.3d at 1239; *Omwenga*, 244 F. Supp. 3d at 218-20.

Plaintiff cannot even make a good argument that he went outside the usual chain of command. *See Omwenga*, 244 F. Supp. 3d at 218-20. Although he did speak about the payment non-suspension issue with Ms. Kennedy, possibly without his immediate superiors on one or two occasions, he did so only after speaking about the issue six months beforehand with his immediate superiors. *See* Pl.'s Stmt. ¶¶ 29, 32. Accordingly, the record does not reflect any activity by Plaintiff that would raise the "reasonable possibility" of litigation, *see Schweizer*, 677 F.3d at 1239, such that OIG, and in turn Defendant, should have known he was engaged in protected activity under the FCA even when he did not expressly raise the FCA with them.

As a final point, the Court pauses momentarily to observe that Plaintiff's activity is not really the kind for which retaliation would be expected. He discussed an issue repeatedly with his superiors; whether or not because of him, they took some action (i.e., the IG's letter to DHCF) and rejected other action (i.e., including the issue in the Medicaid report); a month or two after his final salvo, he lost the privilege of an alternative work schedule, and a few months after that, he was fired. He had not called public attention to the issue such that Defendant could have objected to the negative publicity. *See, e.g.*, *Williams v. Johnson*, 701 F. Supp. 2d at 15-16 (noting employer's comment the day after public testimony that it made employers "look like 'crooks'"). Plaintiff could have called public attention if he had included the issue in his audit report, but some testimony suggests that the payment non-suspension issue was removed from the draft report even during his time there. *See* Dep. of Paul Hicks at 76:12-15, Pl.'s Ex. E, ECF No. 33-10 (Q. . . . The alleged fraud and the failure to suspend payments issue, was that ultimately included in the audit report? A. It was not."); Dep. of Leroy Rose at 77:5-8, Pl.'s Ex. C, ECF No. 33-8 (Q. Did you comply with upper management's instruction and remove the improper payment find, then? A. I believe I did."); *id.* at 80:13-20 (removing the payment non-suspension issue "would have been

prior to [Plaintiff's] departure"). If Plaintiff's retaliation claims had survived summary judgment, then it would be the role of the jury to weigh these facts, but they appear an ill fit for the statutory regime governing retaliation.

The Court is mindful of the "special caution" to which a plaintiff defending against a motion for summary judgment on a retaliation claim may be entitled. *See Aka*, 116 F.3d at 879-80 (urging such caution in discrimination context); *Walker*, 279 F. Supp. 3d at 258 (same in DCWPA context). But Plaintiff has not produced competent evidence of protected activity that could raise a genuine dispute of material fact sufficient to preclude summary judgment. *See Brown*, 674 F. Supp. 2d at 188. Defendant made good cause arguments for its non-suspension of payments, and Plaintiff has not put forward any evidence that Defendant made false or fraudulent claims to the federal government or D.C. general fund for payment. He reported internally on what might have been non-compliance with laws, but he did not clearly signal that he was doing anything other than exercising his normal job responsibilities. Any "special caution" owed to the Plaintiff does not warrant the degree of solicitude that would be required to overlook each of these shortfalls in Plaintiff's *prima facie* task of establishing protected activity.

Because Plaintiff has failed to establish that he engaged in protected activity under the federal FCA and DCFCA, the Court need not reach the second element of Plaintiff's *prima facie* case, namely whether OIG was aware of that protected activity and retaliated accordingly. *See Shekoyan*, 409 F.3d at 422.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS-IN-PART and DENIES-IN-PART** Defendant's Motion for Summary Judgment, ECF No. 32. The Court grants summary judgment to Defendant on Plaintiff's retaliation claims under the District of Columbia Whistleblower

Protection Act, D.C. Code §§ 1–615.51 *et seq.*, federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and District of Columbia False Claims Act, D.C. Code §§ 2–381.01 *et seq.*  The jury must decide Plaintiff's claims of age discrimination under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq.*, and of racial discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*

The Court **GRANTS** Plaintiff's Motion to Seal Certain Exhibits Which Accompany Defendant's Motion and Plaintiff's Opposition Thereto, ECF No. 33-5.  Defendant's Exhibits 1, 3, 4, 5, and 9 attached to Defendant's Motion for Summary Judgment, ECF No. 32, shall be placed under seal pursuant to the parties' Protective Order, ECF No. 28.  Plaintiff's Exhibits B, D, K, L, M, N, O, T, and aa, which accompany his Opposition to Defendant's Motion for Summary Judgment, ECF No. 33, also shall be placed under seal pursuant to the parties' Protective Order.

The Court **DENIES** Plaintiff's Request for an Oral Hearing, ECF No. 35.

An appropriate Order accompanies this Memorandum Opinion.

Dated:  March 30, 2018

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge
